Eastern District of Kentucky

**F I L E D**

**MAR 3 0 2012**

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

KAREN BROWN,                    )
                                )
        Petitioner,             )
                                )
v.                              )          No. 5:08-CV-280-KSF
                                )
                                )      MEMORANDUM OPINION
WARDEN COOKIE CREWS,            )          & ORDER
                                )
        Respondent              )
                                )
                                )

\* \* \* \* \* \* \* \* \* \*

On June 23, 2008, Petitioner Karen Brown, by counsel, filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. DE #6 (Petition). Respondent, Warden Cookie Crews, responded in opposition, DE #19 (Response), and Petitioner replied, DE #25 (Reply). The matter is now ripe for consideration.

In accordance with local practice, this matter was referred to the Magistrate Judge for consideration pursuant to 28 U.S.C. 636(b). *See* Fed. R. Civ. P. 72(b). However, in the interests of judicial economy, the Court hereby withdraws the reference of this action to the Magistrate Judge.

For the reasons discussed below, the Court **DENIES** the petition. Petitioner fails to justify displacing the treatment of the matter by the courts of the Commonwealth.

**I.     BACKGROUND INFORMATION**

Following a joint trial in Fayette Circuit Court, Petitioner, Karen Brown, and her co-defendant, Elizabeth Turpin, were convicted of capital murder in the death of Turpin's husband Michael. *See* Appendix, at 1-4 (Judgment), 655. Although the case was death

eligible, the jury sentenced both to life in prison without the possibility of parole for twenty-five years. *See id.* A third co-defendant, Keith Bouchard, pled guilty to the crime before trial. *See id.* at 653. He received a life sentence in exchange for testimony against Brown and Turpin. *See id.*

The record indicates that Petitioner, Turpin, and Bouchard met in 1985 when they worked together at a car dealership in Lexington, Kentucky. DE #6 at 6; DE #19 at 3. The three also socialized outside of work, and Brown had a romantic interest in Turpin. *See* DE #6 at 6; DE #19 at 3. Testimony at trial suggested that although Turpin was recently married, she was not satisfied in her relationship with Michael. *See* Appendix, at 653. She claimed that he was physically abusive, and in January 1986 she stated that she planned to divorce him. *See id.* In the same time period, Michael made Turpin the beneficiary of his $50,000 life insurance policy. *See id.*

On February 2, 1986, Petitioner, Turpin, and Bouchard spent the evening together at The Circus, a local club. *See id.* at 654. Later that night or in the early morning hours of February 3, all three ended up at Petitioner's apartment. *Id.* At some point, Brown and Bouchard decided to go to Turpin's apartment; Brown now denies knowing that Turpin and Bouchard intended for Bouchard to murder Michael, stating she believed they were only going to "rough him up". *See* DE #19 at 9; DE #6 at 62. Brown helped Bouchard gain entry to the home, and Bouchard attacked Michael, stabbing him repeatedly. *See* Appendix, at 654; DE #19 at 11. Brown assisted Bouchard in cleaning up the scene and disposing of the body at a local golf course. *See* Appendix, at 655; DE #6 at 62; DE #19 at 10-11. Brown, Bouchard, and Turpin quickly became suspects in the crime. *See* Appendix, at 652.

Upon conviction, Brown appealed to the Kentucky Supreme Court. *See* Appendix, at 5. In relevant part, she argued that the trial court failed to prohibit the prosecutor from engaging in improper leading questioning of Bouchard on direct examination. *Id.* at 45-50. She further argued that the trial court violated her constitutional rights by locking the courtroom doors during trial proceedings and submitting an improper aggravating factor instruction to the jury. *Id.* at 54-62. The Kentucky Supreme Court affirmed Brown's conviction. Appendix, at 141-47; *see also Brown v. Commonwealth*, 780 S.W.2d 627 (Ky. 1989). The United States Supreme Court denied Brown's petition for writ of certiorari. Appendix, at 237.

Many years later, Brown attacked her conviction collaterally in state court, filing a motion to vacate, set aside, or correct her sentence under Kentucky Rule of Criminal Procedure 11.42. *See* Appendix, at 239. Initially, the trial court denied the motion without holding a hearing. *See id.* The Kentucky Court of Appeals reversed, finding that an evidentiary hearing was required. *Id.* at 240. Following the hearing on remand, the Fayette Circuit Court set aside Brown's conviction. *Id.* at 243-45. The trial court found that Julius Rather, Brown's counsel, provided ineffective assistance when he advised her not to testify in her own defense and when he failed to present adequate mitigation evidence during the penalty phase of her trial. *Id.* The trial court specifically found, however, that Rather's failure to further investigate the mental health and competency of Keith Bouchard did not constitute ineffective assistance. *Id.* at 243.

The government appealed the Fayette Circuit Court's decision, and Brown cross-appealed. *Id.* at 246, 368. The Kentucky Court of Appeals then reversed the trial court's order granting post-conviction relief, reinstating Brown's conviction. *Id.* at 450. The

3

Supreme Court of Kentucky granted discretionary review and unanimously affirmed the decision of the Court of Appeals. *Id.* at 528, 652; *see also Brown v. Commonwealth*, 253 S.W.3d 490 (Ky. 2008). The court denied Brown's petition for rehearing. Appendix, at 694. Thereafter, Brown filed the habeas petition currently before the Court.[1]

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, established a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 125 S. Ct. 847, 853 (2005) (quoting *Woodford v. Visciotti*, 123 S. Ct. 357, 360) (2002) (per curiam)) (quoting *Lindh v. Murphy*, 117 S. Ct. 2059, 1067 n. 7 (1997)). Specifically, AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In contrast, when a state court has not addressed the merits of a properly presented claim, the reviewing federal court assesses the claim *de novo*. *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007). A petitioner bears the burden of

---

[1] The Court raised, at screening, the issue of timeliness. DE #24. The Commonwealth expressly accepts that the petition is timely under the AEDPA, and the Court thus proceeds to the merits. *Solomon v. United States*, 467 F.3d 928, 932 n. 5 (6th Cir. 2006) (AEDPA statute of limitations a waivable affirmative defense).

establishing that relief is warranted. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)) (quoting *Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001)).

As the United States Supreme Court has articulated, "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.'" *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000) (O'Connor, J., opinion of the Court for Part II)). In this regard, "clearly established law under the Act encompasses more than just bright-line rules laid down by the Court. It also clearly includes legal principles enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002). At the same time, habeas review focuses on the holdings of the Supreme Court, not its *dicta* or holdings of the courts of appeals. *Williams*, 120 S. Ct. at 1523 (regarding *dicta*); *id.* at 1507 (quoting *Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir. 1996) (citing *Teague v. Lane*, 109 S. Ct. 1060 (1989)) (regarding reliance on jurisprudence from courts of appeals).

Regarding the "unreasonable application" clause, the Supreme Court has held that "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S. Ct. at 1523. The writ may not issue solely because the state court incorrectly applied the relevant Supreme Court precedent; instead, the state court's misapplication must have been objectively unreasonable. *Id.* at 1521-23. In determining whether the state court misapplied

Supreme Court precedent, a federal court may look only to the state of the case law "as of the time of the relevant state-court decision" *Id.* at 1523. Ultimately, the habeas court should not grant relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

As to any "unreasonable determination of the facts" claim, a federal court must presume all determinations of factual issues by the state court to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Findings of fact entitled to the presumption include "[p]rimary or historical facts found by state courts," *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000), as well as factual findings made by state appellate courts based upon the trial record. *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003) (citing *Sumner v. Mata*, 101 S. Ct. 764, 769 (1981)). However, the presumption does not fully apply when, as with an ineffective assistance claim resolved on the merits, the § 2254 petition involves mixed questions of law and fact. *See Strickland v. Washington*, 104 S. Ct. 2052, 2070 (1984); *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007). In essence, while federal courts need not defer to ultimate findings regarding ineffectiveness of counsel, the "underlying facts" supporting such state court decisions warrant deference. *Strickland*, 104 S. Ct. at 2070; *accord Abdur'Rahman v. Bell*, 226 F.3d 696, 702 (6th Cir. 2000).

There need not be an opinion articulating the state court's reasoning in order to determine whether the state court's decision is the result of an unreasonable legal or factual conclusion. *Richter*, 131 S. Ct. at 784. Indeed, "a state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d) .... Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be

met by showing there was no reasonable basis for the state court to deny relief." *Id.* And unless the petitioner affirmatively shows that the state court's decision "did *not* involve a determination of the merits of his claim," such as where the opinion expressly states the claim was denied on procedural grounds, § 2254(d) applies on habeas review. *Id.* at 784-85. Where the state court resolves a petitioner's claim of error without articulating its reasons for the denial, then:

> Under § 2254(d), a habeas court must determine what arguments or theories supported or … could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id.* at 786; *accord Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (independent review where state court does not articulate reasoning for denial is "not a full, de novo review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA").

If errors occurred, the reviewing court must evaluate whether they constitute "trial errors," "whose effect may be 'quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt,'" or "'structural defects,' which 'defy analysis by harmless error.'" *Jensen v. Romanowski*, 590 F.3d 373, 378 n.4 (6th Cir. 2009) (citing *Brecht v. Abrahamson*, 113 S. Ct. 1710, 1717 (1993) (quotation omitted)). With "trial errors," the reviewing court evaluates directly whether the error had a substantial and injurious effect in determining the jury's verdict. *Id.* (citing *O'Neal v. McAninch*, 115 S. Ct. 992, 993-94 (1995)). If any error had little or no effect, then no habeas relief should be afforded. *Id.* However, if the reviewing court finds itself at least in "virtual equipoise" about the harmlessness of the

error, the court must grant the writ. *Id.* As to "structural defects," reversal of the state-court conviction may be required without harmless error analysis. *Id.*

**III.    ANALYSIS**

Petitioner raises eight total claims, which, solely for ease of organization, the Court groups into claims related to (A) prosecutor conduct and trial court decisions and (B) trial counsel's performance. The Court analyzes each claim below.

A.    Claims Related to Prosecutor Conduct and Trial Court Decisions

First, Brown argues that any of four problems with the Kentucky courts' treatment of prosecutor conduct and trial court decisions merit § 2254 relief.

> *1.    Trial Court's Aggravating Factor Instruction*

Petitioner argues that the trial court improperly instructed the jury under Kentucky Revised Statute § 532.025(2)(a)(4) and that, as a result, the jury imposed a sentence that would not otherwise have been possible. DE #6, at 36-37. KRS 532.025(2)(a) provides a list of aggravating circumstances a trial court may instruct the jury to consider, if supported by the evidence in death penalty cases. KRS 532.025(2)(a)(4) specifically sets forth the following aggravating circumstance: "The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit."

Brown raised this issue on direct appeal to the Kentucky Supreme Court. She argued that the trial court denied her due process under the Eighth and Fourteenth amendments by submitting the § 532.025(2)(a)(4) aggravating-factor instruction to the jury. Appendix, at 58-62. The Kentucky Supreme Court denied relief, holding:

> The instruction regarding the aggravating factor which was patterned after K.R.S. 532.025(2)(a)(4) was correct. The statute requires a

finding that the offender committed the offense of murder for himself or another for the purpose of receiving money or any other thing of monetary value, or for other profit. Brown argues that this permitted the jury to find the aggravating circumstance if her purpose in the murder was unrelated to herself being the recipient of some benefit. Brown's argument that the statute is ambiguous is unconvincing. The testimony indicated that Brown offered the killer from $2,000 to $10,000 for the murder. She said that the money would come from the deceased's life insurance. There was proof that Brown was involved in this murder for the purpose of monetary gain and other profit. The fact that the insurance policy on the victim's life was not directly payable to her does not mean that she did not intend to share in the proceeds.

Appendix, at 150.

In her habeas petition, Brown briefly argues that the Kentucky Supreme Court unreasonably determined that there was "proof" she had a pecuniary motive for participating in the murder. DE #25 at 4; *see also* DE #6 at 40. Brown fails, however, to rebut by clear and convincing evidence the presumption that the state appellate court's factual finding is correct. *See* 28 U.S.C. § 2254(e)(1). Accordingly, the state court's factual determination stands. The Court notes that Brown herself was the contact person for Bouchard, negotiated with him concerning the fee, and thus anticipated access to the insurance proceeds that would fund the fee payment. She cites nothing to undercut the state court's presumptively correct reading of the record.

Brown also contends that the trial court's instruction was inconsistent with the plain language of the underlying statute and Kentucky case law because it allowed the jury to impose an aggravated sentence if it believed either she, Bouchard, and/or Turpin participated in the scheme to gain financial benefit. DE #6 at 38-40. Federal habeas courts generally do not consider state court determinations on issues of state law. *Estelle v. McGuire*, 112 S. Ct. 475, 480 (1991). Thus, the Court rejects Brown's argument to the extent it addresses the correct interpretation of the aggravating factor statute. The Court

9

limits its review to "deciding whether [Brown's] conviction violated the Constitution, laws, or treaties of the United States." *Id.* (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 96 S. Ct. 175, 177 (1975) (per curiam)).

Turning to her federal law arguments, Brown suggests that KRS 532.025(2)(a)(4) – along with the tracking instruction – is unconstitutional. DE #6 at 38. The focus of her argument, however, is that the trial court applied the statute to her in an unconstitutional manner. *Id.* at 38-39. Specifically, she argues that the phrasing of the instruction permitted the jury to punish her more severely for Turpin's (or Bouchard's) motives in violation of *Enmund v. Florida*, 102 S. Ct. 3368 (1982). DE #25, at 4; *see also* Appendix, at 58-62. In this way, she contends the instruction failed to accomplish a genuine narrowing of the class of persons eligible for an aggravated sentence, as required by *Zant v. Stephens*, 103 S. Ct. 2733, 2742 (1983), and applied the harsher of competing interpretations of the statute, contrary to *United States v. Bass*, 92 S. Ct. 515, 522 (1971). DE #25, at 2-3.

As a threshold matter, Brown contends that the Kentucky Supreme Court failed to consider these federal constitutional arguments and that this Court should review them *de novo*. Petitioner fails to demonstrate that the Kentucky Supreme Court decided her federal claims on grounds other than the merits. This is especially the case since the Kentucky Supreme Court expressly acknowledged Brown's contention that the instruction permitted the jury to apply the aggravating circumstance even if it did not find that her own motive was pecuniary gain, thereby referencing Brown's federal constitutional argument. *See* Appendix at 147. Accordingly, the Court must defer to the

10

state court's decision per § 2254(d). Under that standard, Petitioner is not entitled to habeas relief.

Both KRS § 532.025(2)(a)(4) and the Kentucky courts' application of it in Brown's case comport with the federal principles Brown cites. Again KRS § 532.025(2)(a)(4) permits a jury to impose an aggravated sentence for murder if the offender committed the offense "for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit." The trial court's instruction permitted the jury to sentence Brown to life in prison without parole if it determined that she "committed the offense of murder as to Michael Turpin for herself, or Ellizabeth Turpin, or Keith Bouchard, for the purpose of receiving money or any other thing of monetary value, or for other profit." *See* Appendix, at 59-60. Thus, the trial court's instruction essentially restated the language of the statute, substituting "or Elizabeth Turpin, or Keith Bouchard" for "or another."

In upholding the statute and instruction, the Kentucky state courts did not unreasonably apply or act contrary to the principles of *Zant*. Indeed, consistent with *Zant*, the statute and instruction "genuinely narrow the class of persons eligible for the death penalty" by limiting the class to those motivated by financial gain. *See Zant*, 103 S. Ct. at 2742. The instruction required the jury to find that Brown "committed" murder "for the purpose" of her own financial gain. Moreover, the statute is not ambiguous, and the trial court, essentially restating the statutory language, did not apply an unconstitutionally unfavorable interpretation. The Kentucky courts thus did not run afoul of *Bass*'s statutory construction rule. Finally, Brown's argument that the Kentucky courts permitted the jury to punish Brown based on Turpin's (or Bouchard's) motives is

11

without merit. *See Lockett v. Ohio*, 98 S. Ct. 2954, 2965 (1978) (explaining that "individualized consideration" is a constitutional requirement in sentencing defendants convicted of capital crimes). The instruction did not permit, nor did the Kentucky Supreme Court's holding contemplate, such a result. The state courts clearly required the jury to find that Brown's purpose in committing murder was personal financial gain; the record supported the jury's finding. Under *Richter*, Kentucky's treatment is within the range of fairminded dispositions and thus beyond habeas revision. Accordingly, Brown's petition for a writ based on the aggravating factor instruction fails.

    2.    *The Trial Court's Practice of Locking the Courtroom Doors*

Next, Petitioner asserts that the trial court's practice of locking the courtroom doors during trial proceedings, only opening them to allow spectators to enter and exit during recesses, violated her Sixth Amendment right to a public trial. DE #6, at 42. In considering the issue on direct appeal, the Kentucky Supreme Court held:

> Brown's complaint that after admission of the public the court room doors were locked while the trial was in progress was not properly preserved for appellate review. RCr 9.22. Even alleged constitutional questions may be waived if they are not presented to the trial judge. *Payne v. Commonwealth*, 623 S.W.2d 867 (1981) cert. den. 456 U.S. 909, 102 S. Ct. 1758, 72 L.Ed.2d 167 (1982). The authorities cited by Brown involve situations where the defendants raised timely objections before the trial judge. In this case no timely objection was made. The issue was not properly preserved and there is no basis for invoking any palpable error rule pursuant to RCr 10.26 because there was no manifest injustice.

Appendix, at 146-47.

Brown concedes that her counsel failed to object to the trial court's decision to lock the doors of the courtroom. DE #6 at 43; *see* Appendix, at 54. She argues, however, that her trial counsel's failure to object to the court's policy was insufficient to waive her right to a public trial, and she did not otherwise knowingly and intelligently waive that

right. DE #6 at 41-42. Brown further argues that the Kentucky Supreme Court erred by requiring her to demonstrate "manifest injustice," or prejudice, in order to obtain review of her public trial claim. *Id.* at 43-44. Brown cites *Waller v. Georgia*, 104 S. Ct. 2210, 2217 (1984), for the proposition that a defendant does not have to show prejudice in order to obtain relief for a violation of her right to a public trial.

*Coleman v. Thompson*, 111 S. Ct. 2546 (1991), bars Brown's claim on this issue. In *Coleman*, the Supreme Court held,

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 2565. Here, Brown defaulted her Sixth Amendment public trial claim pursuant to Kentucky Rule of Criminal Procedure 9.22, an independent and adequate state procedural rule, by failing to object at the trial court level. She demonstrates no cause for the default, other than, perhaps, her counsel's ineffectiveness. But the ineffectiveness of counsel "constitute[s] cause only if it is an independent constitutional violation." *Coleman*, 11 S. Ct. at 2567. Although Brown alleges in her § 2254 petition that trial counsel was constitutionally ineffective in multiple ways, his failure to object to the locking of the courtroom doors is not one of them. Additionally, Brown does not point to any actual prejudice resulting from the alleged violation of her Sixth Amendment public trial right, nor does she show that failure to consider her claim will result in a fundamental miscarriage of justice.

Further, the Kentucky Supreme Court's requirement that Brown demonstrate manifest injustice before it would review her claim (and, for that matter, *Coleman*'s

similar requirement of a showing of actual prejudice for habeas review of procedurally defaulted claims) does not run afoul of *Waller*. In *Waller*, the Supreme Court found that a defendant does not have to "prove specific prejudice in order to obtain *relief* for a violation of the public-trial guarantee." *Waller*, 104 S. Ct. at 2217 (emphasis added). *Waller* says nothing about the standards for obtaining *review* of a procedurally defaulted Sixth Amendment claim. Brown confuses the standards for obtaining review and obtaining relief. She does not establish that *Waller*'s provisions, even if implicated in this case, would not be subject to the procedural default rule. The Sixth Circuit recognizes that the public trial right is subject to procedural default. *See Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009) ("While we agree that the right to a public trial is an important structural right, it is also one that can be waived when a defendant fails to object to the closure of the courtroom[.]"); *id.* (subjecting *Waller* claim to *Coleman* analysis).

Even if the independent and adequate state ground doctrine did not serve as a bar to Brown's public trial claim, the Court likely would not find a constitutional violation. The trial court announced its decision to lock the courtroom doors, explaining that "the conduct of the trial should be dignified and effective and uninterrupted and unannoyed". *See* DE #19 at 34. The trial court noted that members of the public were welcome to observe the trial, but the doors, as a matter of order, would be locked after proceedings commenced each morning. *See id.* at 35. During recesses, audience members were free to come and go from the courtroom. *See id.* Thus, this is not a case in which the court completely closed proceedings to the press and public. *See Waller*, 104 S. Ct. at 2213; *Richmond Newspapers, Inc. v. Virginia*, 100 S. Ct. 2814 (1980).

14

Further, in *Richmond Newspapers*, the Supreme Court found:

> Just as the government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. The question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places. It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets.

100 S. Ct. at 2830 n. 18 (internal citations and quotation marks omitted). Here, the court's limitations on access to Brown's trial appear reasonably calculated to facilitate the orderly progress of trial, and they did not deny or abridge public discourse. The Court notes that in a separate claim for relief on the ground of ineffective assistance of counsel, Brown states that "spectators overflowed from the courtroom" on the first day of her trial. DE #6 at 98. She adds that people waited in line and competed for seats. *Id.* Maintaining order with respect to the access given is distinct from prohibiting access. The public had access to Brown's trial at all times.

Ultimately, however, the Court need not decide the constitutional issue. Having procedurally defaulted her claim, Brown is not entitled to habeas relief.

### 3. *Prosecutor's Questioning of Witness Bouchard*

As a third ground for relief, Brown contends that the trial court failed to provide the safeguards to guarantee fair trials in capital cases as required by the United States Supreme Court and the due process clause of the Fourteenth Amendment. DE #6 at 46-51. More particularly, Petitioner argues "the trial court refused to expressly prohibit the prosecutor from examining Bouchard through leading questioning." *Id.* at 46. Petitioner concedes that the trial court sustained objections to leading questions made by defense

counsel, but contends the court failed to enforce its own rulings. *Id.* In support of her

argument, Brown cites only one Supreme Court case, *Gardner v. Florida*, 97 S. Ct. 1197

(1977).

Brown made the same argument on direct appeal. The Kentucky Supreme Court

rejected her claim. Specifically, the court concluded:

> There was no reversible error in regard to the method of
> questioning prosecution witness Bouchard. At trial, counsel for Brown
> stated during a bench conference that he was going to object to leading
> questions by the prosecutor. The trial judge then admonished the
> prosecutor not to lead the witness. The trial judge sustained defense
> counsel's objections to leading questions, and Brown did not request any
> further relief. There was no reversible error. *Humphrey v.
> Commonwealth*, Ky., 442 S.W.2d 599, 601 (1969).

Appendix, at 148-49.

Thus, the Kentucky Supreme Court determined that Brown's claim was

procedurally barred under state law. The court cited *Humphrey*, in which it held that it is

"incumbent on [a defendant] to ask for an admonition or mistrial" if he believes that the

sustaining of his objection is not a sufficient remedy. 442 S.W.2d at 601; *see also* Ky. R.

Crim. P. 9.22 (party should "make[] known to the court the action which the party desires

the court to take or any objection to the action of the court"); *West v. Commonwealth*, 780

S.W.2d 600, 602 (Ky. 1989) (failure to comply with Rule 9.22 renders error

unpreserved). Federal habeas courts "'must defer to a state court's interpretation of its

own rules of evidence and procedure' when assessing a habeas petition." *Miskel v.

Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614

(6th Cir. 1988)). Accordingly, an independent and adequate state ground supports the

Kentucky courts' decision, and federal habeas review is barred unless Brown

demonstrates cause for the default and actual prejudice resulting from the alleged federal constitutional violation. *Coleman*, 111 S. Ct. at 2565.

Brown argues she can demonstrate cause and prejudice. DE #25, at 9. She claims the trial judge's "inertia" and the risk of irritating the jury in the face of the trial judge's clear intent not to enforce his ruling excuse the failure to repeatedly object. *Id.* Petitioner maintains the leading questioning prejudiced her case because highly damaging testimony came in through the "implantation of memories which did not exist and were not reliable." *Id.*

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 106 S. Ct. 2639, 2646 (1986). Petitioner cites no external, objective force that prevented her counsel from repeatedly objecting to the prosecutor's continued leading of witness Bouchard. There is no indication the trial judge forbade further objections. Speculation that re-asserting the objection may have irritated the jury is a subjective, not objective, factor. Further, there is no indication the trial court prohibited Brown from seeking an admonition to the jury or a mistrial. Because Brown cannot establish cause for the procedural default, her § 2254 petition must be denied.

Even if Brown had properly preserved the issue, her claim would not merit habeas relief. In *Gardner*, the Supreme Court held that a habeas petitioner was deprived of life without due process of law when the trial court sentenced him to death based in part on information in a presentence investigation report not disclosed to the parties, and the Florida Supreme Court affirmed the sentence without reviewing the undisclosed,

17

confidential portions of the report. 97 S. Ct. at 1201. Brown cites *Gardner* for the broad proposition that states must "provide stringent safeguards to protect the rights of defendants in capital cases." DE #6 at 51. Where a constitutional standard is general, "the range of reasonable applications is substantial." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Here, again, the trial court sustained Brown's objections to the leading questioning of Bouchard. Brown complains only that the trial court failed to continuously and prospectively enforce its rulings without a pending objection or other request for relief. Brown's citation to *Gardner* fails to establish that the state courts' decisions were either contrary to or an unreasonable application of federal constitutional law.[2] 28 U.S.C. § 2254(d).

### 4. Prosecutor's Duty to Disclose Mental Illness Evidence

Next, Brown argues that the Commonwealth violated *Brady v. Maryland*, 83 S. Ct. 1194 (1963), by withholding vital evidence of prosecution witness Bouchard's mental illness. DE #6, at 89. Specifically, although the Commonwealth disclosed to defense counsel a report by Dr. Irvin Blose finding Bouchard competent to stand trial, it did not provide records from the Kentucky Correctional Psychiatric Center ("KCPC") and Comp Care indicating Bouchard suffered from affective disorder and thought disorder. *Id.* at 90-91. Brown argues that the suppressed records constitute significant impeachment evidence.

---

[2] In her reply brief (DE 25, at 8), Brown also cites *Green v. United States*, 348 F.2d 340 (D.C. Cir. 1965). There, the Court of Appeals for the District of Columbia Circuit explained that a "trial court may permit leading questions where, for example, the witness has forgotten some events or is ignorant or even reluctant to testify." *Id.* at 341. Brown emphasizes, however, the court's warning that "this discretion must be exercised with great caution to avoid the 'evil . . . of supplying a false memory for the witness.'" *Id.* (quoting *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963)). In *Green* defense counsel objected to leading questioning "[i]n several instances . . . and was peremptorily overruled by the court with no reason given." *Id.* Thus, the facts in *Green* are inapposite.

Respondent counters that Brown procedurally defaulted this claim because she did not raise it in state court. DE #19 at 57-58. The Court agrees. Although Brown appears to argue that the Kentucky Court of Appeals failed to recognize her *Brady* argument, instead evaluating the issue solely in terms of ineffective assistance of counsel, *see* DE #6 at 92-93, the Court finds it notable that the 697-page appendix of state court proceedings includes not one mention of *Brady*. Further, Brown concedes that she did not present the issue to the Kentucky Supreme Court. *Id.* at 93.

In her reply brief, Petitioner attempts to demonstrate cause for the default. She contends she could not have raised the *Brady* issue before the trial court because she did not learn the records existed until post-conviction. DE #25 at 15. In support of this argument, Brown relies on *Strickler v. Greene*, 119 S. Ct. 1936 (1999), where the Supreme Court recognized that the government's failure to disclose exculpatory evidence to a defendant constitutes conduct "that impede[s] trial counsel's access to the factual basis for making a *Brady* claim." *Id.* at 1949. According to the Court, such conduct "ordinarily establish[es] the existence of cause for a procedural default." *Id.*

Here, however, it is obvious Brown knew about the KCPC and Comp Care reports at some point during the state appellate process. Brown does not detail the point of realization. DE #6 at 91 (acknowledging awareness "post conviction"). As noted by Respondent, Brown stated in her brief before the Kentucky Court of Appeals that her "trial counsel was entitled to and would have been given reports from K.C.P.C., the jail and Comp Care had he made the request." Appendix, p. 413. Thus, while Brown may be able to demonstrate cause for her failure to raise the *Brady* claim before the trial court, she cannot show cause for her failure to raise the claim on appeal, at least with respect to

19

Case: 5:08-cv-00280-KSF-REW Doc #: 41 Filed: 03/30/12 Page: 20 of 36 - Page ID#: 597

the RCr 11.42 appeal. By failing to raise it on appeal, Brown deprived the state courts of the proper first opportunity to address her federal claim. *See Coleman*, 111 S. Ct. at 2555. Habeas review therefore is barred.

Even if Brown could establish cause for the default, she could not establish the prejudice required to warrant § 2254 review. In order to give rise to sufficient prejudice to overcome a procedural default, suppressed evidence must be "material" for *Brady* purposes. *Strickler*, 119 S. Ct. at 1949. Under *Brady*, it is a violation of due process for the prosecution to withhold exculpatory evidence from an accused "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 83 S. Ct. at 1196-97. "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 119 S. Ct. at 1948 (quoting *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375 (1985)). As stated by the Supreme Court in *Kyles v. Whitley*, 115 S. Ct. 1555, 1566 (1995), "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." The materiality of undisclosed evidence must be considered collectively. *Id.* at 1567. Relatedly, "the omission must be evaluated in the context of the entire record." *United States v. Agurs*, 96 S. Ct. 2392, 2402 (1976).

The KCPC and Comp Care records were not material under this analysis. As the state courts determined, and as set forth more fully in the discussion of Brown's ineffective assistance claims, Brown's trial counsel did not seek or want to impeach Bouchard on the basis of his mental health. *See* Appendix, at 673-74. Because Brown

20

was present at the scene of the murder, counsel's strategy was to convince the jury that Brown was less culpable than Bouchard for the crime. *Id.* at 674. Specifically, he wanted the jury to find that Bouchard was the leader in the scheme. *Id.* Counsel believed doubts about Bouchard's mental health would undermine that strategy. *Id.* Accordingly, viewed in the context of all the evidence, the KCPC and Comp Care records were not material, and the verdict is worthy of confidence.

Further, because the evidence does not meet the test for materiality, Brown's *Brady* claim also fails on the merits. No habeas relief is available to Petitioner on this issue.

B.     Claims Related to Trial Counsel's Performance

The pending § 2254 petition also sets forth four ineffective assistance of counsel claims, which present mixed questions of law and fact. *See Strickland v. Washington*, 104 S. Ct. 2052, 2070 (1984); *United States v. Wagner*, 382 F.3d 598, 615 (6th Cir. 2004). Essentially, with each of these claims, Brown argues that the Kentucky Supreme Court unreasonably applied the holding in *Strickland*. Under *Strickland*, a petitioner asserting an ineffective assistance claim must prove, by a preponderance of the evidence, both deficient performance and prejudice. *Strickland*, 104 S. Ct. at 2064; *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006). First, in order to prove deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 104 S. Ct. at 2064. A petitioner meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 2064-65.

Judicial scrutiny of counsel's performance, however, is "highly deferential," consisting of a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 2065.

Deficient performance is considered constitutionally prejudicial, the second prong of the analysis, only when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 2064. In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When evaluating prejudice, courts must take into consideration the "totality of the evidence before the judge or jury." *Id.* at 2069.

Recently, the Supreme Court commented on the interaction between the § 2254(d) and *Strickland* standards of review. *See Harrington v. Richter*, 131 S. Ct. 770 (2011). The Court emphasized that "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785. Thus, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Later, the Court stated that it is "difficult" to establish a state court's application of *Strickland* as unreasonable under § 2254(d), noting that both standards are "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (citations omitted). The Court cautioned habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* According to the Court, under §

22

2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Additionally, the Court noted that "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* (citation omitted).

### 1.    *Trial Counsel's Advice that Defendant Should Not Testify*

Petitioner asserts that her trial counsel provided constitutionally ineffective assistance by advising her not to testify during the guilt phase of the trial. DE #6 at 55. Brown has not shown entitlement to section 2254 relief on this issue. In its ruling in the context of Brown's Kentucky Rule of Criminal Procedure 11.42 motion to vacate or set aside her conviction, the Kentucky Supreme Court correctly identified controlling Supreme Court precedent and applied that precedent reasonably to the facts of this case.[3] *See* 28 U.S.C. § 2254(d)(1). Thus, its determination should not be disturbed here.

Following an evidentiary hearing, the Fayette Circuit Court granted Brown relief on this issue. Appendix, at 243-45. The court held in relevant part:

> The ruling on this motion is based on the failure to require the movant to testify .... It is understandable that counsel had concerns on the Movant's statement coming into evidence in its entirety had she taken the stand and that she would face a grueling cross-examination. However, the only way to sway the jury that she was innocent was to have her testify. She was placed at the scene and her co-defendant, along with the prosecutor's chief witness, Keith Bouchard, testified against her. Movant's innocence could not be expressed unless she testified. Counsel argued for a renunciation instruction, which was denied due to no evidence of renunciation. Had Movant taken the stand she could have testified that she was present but

---

[3] Brown separately argues that here (indeed generally) the Kentucky courts incorrectly stated the *Strickland* standard for determining whether counsel's deficient performance resulted in prejudice to the defendant, holding her to a higher standard of proof. *Id.* at 53-54. As discussed in the body of this Recommended Disposition, however, the Court finds no error in the Kentucky courts' application of the *Strickland* standard to the facts of Brown's case, which is the issue in federal habeas review. In addition, the Court notes that the Kentucky Supreme Court never reached the prejudice prong of the analysis, as it found that the performance of Brown's counsel was neither deficient nor unreasonable. Ultimately, the Court does note that the *Richter* formulation draws only the finest of lines between *Strickland*'s prejudice standard and a but-for model. *See Richter*, 131 S. Ct. at 792.

> did not take part in the crime and that she tried to stop it. This could have been a basis for a renunciation instruction.
>
>     If Counsel [sic] theory was to not let her testify and to convince the jury that she was innocent it appears that Counsel would have to change his strategy at the end of the Commonwealth's proof, which would have led to the Movant's testifying.

*Id.* at 243-44. The court cited not a single case in support of its decision. *See id.*

    The government appealed the trial court's decision, and the Kentucky Court of Appeals reversed. *See* Appendix, at 460-68. The Court of Appeals emphasized that in her colloquy with the trial court, Brown "specifically advised the court that, after talking with Rather, she had decided not to testify on her own behalf, and that this decision was made of her own free will and accord." *Id.* at 461. Further, the Court of Appeals agreed with trial counsel's concern that, had he advised Brown to testify, a damaging portion of her statement to police that previously had been suppressed could have become admissible as impeachment evidence on cross-examination. *Id.* at 465-67. Finally, the Court of Appeals focused on differences between the account of events Brown told counsel at the time of trial and the account she later offered at the post-conviction evidentiary hearing. *See id.* at 467-68. The court cited a lengthy passage from *Strickland* for the proposition that trial counsel's advice depends, in part, on information supplied by his client. *Id.*

    Granting discretionary review, the Kentucky Supreme Court upheld the Court of Appeals. *See* Appendix, at 668-71. The Court quotes the analysis at length because of its centrality to the pending § 2254 petition:

>     The trial court's order held that the only way to show that Appellant was innocent at the guilt phase was to have her testify and counter the testimony that Bouchard and Elizabeth [Turpin] presented against her. However, upon a thorough review of the record, Rather's advice to keep Appellant from testifying was not unreasonable and did not

amount to ineffective assistance of counsel. In this analysis, we should not lose sight of the fact that this was a death penalty case.

As an initial matter, we must review Rather's trial actions to see if they were deficient or unreasonable under prevailing professional standards. Rather's initial strategy in this case was to make a plea bargain with the Commonwealth for Appellant. After Appellant rejected the Commonwealth's offer, Rather chose a trial strategy which would show Appellant was either not guilty through a "reasonable doubt" defense in case the Commonwealth's case fell short of their burden of proof, or at the very minimum, show that she was not the leader or mastermind of the scheme to kill Michael in order to insulate her from the death penalty. As Rather stated at the evidentiary hearing, in a death penalty case, *"you don't try things that will make it worse."* In fact, most experienced criminal defense counsel would argue that when all you have in a death penalty case is a possible "reasonable doubt defense," you must focus on avoiding or minimizing facts that could increase your defendant's chance of receiving the death penalty. That, in itself can be considered a victory. *See* Russell Stetler, *Capital Cases: Mitigation Evidence in Death Penalty Cases*, Champion, Jan.-Feb. 1999 at 35 ("The paradox of death penalty litigation is that no case is hopeless, but there is also no guarantee of success – that is, avoiding a death sentence – when a case enters a sentencing proceeding.")[.]

It is with this strategy in mind that Rather made the decision to advise Appellant not to testify. In making this decision, Rather was concerned with keeping incriminating statements that Appellant made to the police suppressed as much as he could. Had Appellant testified, *all* these statements would have obviously been used for impeachment. Those statements included her admission that she had helped Bouchard gain entry into Michael's apartment *fully-knowing his potential intent to kill Michael* and that Appellant had even attempted to borrow a gun from a friend *for Bouchard – not because her father was in town.* Even Appellant, at the evidentiary hearing, admitted that she previously said this statement was full of lies and it was a major reason why she *could not* testify at trial.

During the trial, Appellant obviously agreed with Rather's advice because she discussed her decision not to testify with the judge. She acknowledged it was her own voluntary decision not to testify and that she was not coerced by anyone in making that decision. She further acknowledged that *she knew* she had the right to testify, but was waiving it.

In the evidentiary hearing, Appellant admitted that she was not honest with Rather about what happened the night of Michael's murder but claimed that at some time during the trial she had come clean and let him know her version of the facts. What Appellant initially told Rather was based in part on her desire to protect Elizabeth at the time.

25

Thus, we cannot hold that Rather's strategy to keep Appellant from testifying was professionally unreasonable in light of the facts of the case. From the evidence at hand, it does not appear possible that Appellant could have been found not guilty if she had testified. Interestingly, Elizabeth did testify, yet received the same sentence as Appellant. The risk of the suppressed statement being used to impeach Appellant was too great. Moreover, the admittance of that statement could have increased the risk of the death penalty being imposed.

Importantly, counsel's strategy may be influenced by what his client says. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. His actions are to be viewed in light of what was known at the time of trial and his acts are to be given great deference. *Id.* The trial court failed to give Rather's actions under the particular circumstances of this case the deference required, and thus, committed error.

Additionally, the trial court held that Appellant's testimony may have provided the evidentiary grounds for the trial court to give a renunciation jury instruction. KRS § 506.020 ("it is a defense that, under the circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant abandoned his effort to commit the crime and, if mere abandonment was insufficient to avoid the commission of the crime, took the necessary affirmative steps to prevent its commission.") However, all of the evidence presented at the time of trial indicated that Appellant's declaration "I can't go through with it," occurred *after the attack* on Michael had begun. Appellant's behavior after her statement was also not indicative of someone who took steps to prevent the commission of a criminal act. The slim chance that a jury would buy a renunciation defense was obviously too low for Rather to risk Appellant's suppressed statement being admitted.

Thus, Rather's actions did not constitute deficient or unreasonable professional conduct under the circumstances and evidence he faced at the time. Therefore, the Court of Appeals was correct in holding that Rather did not provide ineffective assistance of counsel by not allowing Appellant to testify at the guilt phase of trial.

Appendix, at 668-71 (emphasis in original).

With this thoughtful decision, the Kentucky Supreme Court clearly provided an objectively reasonable application of the *Strickland* standard. Further, this Court gives due deference to the state court's supportive findings of fact, which are uncontradicted in this record. *See Strickland*, 104 S. Ct. at 2070. In particular, Brown does not challenge the fact that the trial court questioned her on the record about whether she wanted to

26

testify, and she stated that she did not. *See* DE #6 at 58. Additionally, the Court notes that the excluded portion of Brown's statement to police would have been incredibly detrimental to her defense, and would have hazarded greater culpability, if it had been admitted as impeachment evidence. *See* Appendix, at 288-363. She admitted seeking a gun for Bouchard's use and admitted duping Mike Turpin into opening his door, with knowledge of Bouchard's intent. No habeas relief is merited.

2.    *Trial Counsel's Investigation of Bouchard's Mental Illness*

Brown also contends that her trial counsel provided constitutionally ineffective assistance by failing properly to investigate prosecution witness Bouchard's mental illness. *See* DE #6 at 66-77. According to Brown, Bouchard's mental state was in question from the moment he was arrested, and her counsel performed no investigation regarding Bouchard's "ability to perceive things and to accurately recall events." *Id.* at 66. She urges the Court to find that counsel's failure to investigate constitutes deficient performance under the Sixth Amendment. *See id.* at 77.

The Fayette Circuit Court denied relief on this issue. Appendix, at 243. In reviewing Brown's cross-appeal, the Kentucky Court of Appeals affirmed. *Id.* at 471-72. The Court of Appeals described Rather's testimony at the 11.42 hearing:

> Rather testified at the evidentiary hearing that the Commonwealth, in discovery, had provided him with the Kentucky Correctional Psychiatric Center ("KCPC") report on Bouchard's competency. The report found that Bouchard was fit to stand trial and that the strange behaviors he had been demonstrating in confinement were exaggerated or put on. Rather acknowledged that he did not seek out other records pertaining to Bouchard's mental competency or pursue that avenue at trial because he wanted Bouchard to be portrayed as sane and fully cognizant of his actions. Rather reasoned that if Bouchard were found to be incompetent or otherwise mentally disabled, the jury would be more prone to find him as a "follower" in the murder and Brown as a "leader."

27

*Id.* at 471. The Court of Appeals determined that although Rather's actions "might not have led to the absolute 'best' possible defense for Brown," they were the result of a reasonable and conscientious strategic decision that did not constitute ineffective assistance. *Id.* at 472.

On discretionary review, the Kentucky Supreme Court affirmed the decisions of the lower courts. *See* Appendix, 673-74. The court noted that Dr. Wagner, Brown's expert witness at the 11.42 hearing, "testified that the type of depression he believed Bouchard suffered from could cause him to misperceive events and circumstances and to distort both current and past events." *Id.* at 673. The court emphasized, however, that Brown told trial counsel facts "that were not terribly inconsistent with those testified to by Bouchard". *Id.* at 674. The court explained that Brown's trial counsel did not further investigate Bouchard's mental health issues because "[h]e feared that if Bouchard were believed to be incompetent, the blame would fall solely on Appellant, since she was the only other person present at the murder." *Id.* at 674. According to the court, counsel "strongly" cross-examined Bouchard. *Id.* The Kentucky Supreme Court decided that in light of all the facts, Rather's strategy was not deficient or below the prevailing professional standards. *Id.*

The Court cannot find that the Kentucky Supreme Court unreasonably applied *Strickland* or other federal Supreme Court precedent to the facts of the case in reaching its decision. In her petition, Brown focuses on the testimony of Dr. Wagner at the evidentiary hearing on her 11.42 motion. *See* DE #6 at 68-71. But, Dr. Wagner reviewed Bouchard's psychiatric records from 1986 through 1994. *See id.* at 68. Thus, she had the benefit of records made over a number of years following Brown's trial. As noted by the

Supreme Court in *Richter*, "[r]eliance on the harsh light of hindsight to cast doubt on a trial that took place now more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent." 131 S. Ct. at 789 (citation and internal quotation marks omitted). Brown has not made a case for habeas relief under the high standards of § 2254(d). The state court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. Brown theorizes that mental health evidence may have led counsel to attack Bouchard's credibility as a witness. Counsel, fully aware that he could have pursued information to attack Bouchard's mental state, elected instead to accept Bouchard as fully sane and cognizant and try to keep blame on him. Counsel knew Turpin died violently in the presence of Bouchard and Brown, and he knew that Brown's disclosed version matched closely with Bouchard's. He rationally perceived and strategized around the risk that, by attacking Bouchard's mental state, the jury might ultimately treat Brown as a manipulator of Bouchard and thus leader. The Kentucky appellate courts unanimously endorsed the legitimacy of the strategy, which this Court will not disturb on habeas review.

　　3.　　*Trial Counsel's Development and Presentation of Evidence in Mitigation*

Next, Brown claims that she was deprived of her Sixth Amendment right to the effective assistance of counsel at the penalty phase of her trial because Rather failed to develop and present adequate mitigation evidence. DE #6 at 77. She argues that the Kentucky Supreme Court unreasonably applied clearly established federal law in denying relief on this issue. *Id.* Brown complains that Rather only called three witnesses during the penalty phase, failing to call her mother, her father, and others who could provide

insight into her background and circumstances. *See id.* at 79-80. Brown further complains that defense counsel operated under the mistaken belief that nothing positive could come from Brown testifying on her own behalf during this phase of the proceedings. *See id.* at 80. Brown points to the many witnesses who testified for her at the 11.42 hearing in state court, arguing that counsel did not perform a sufficient investigation into potential mitigation evidence. *See id.* at 84-89. Brown cites *Lockett v. Ohio*, 98 S. Ct. 2954, 2965 (1978), and *Eddings v. Oklahoma*, 102 S. Ct. 869, 875 (1982), arguing that trial counsel's deficiencies violated her constitutional right to be considered as an individual during her capital sentencing proceeding. *See DE #6* at 84. She also cites cases such as *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003), and *Coleman v. Mitchell*, 268 F.3d 417, 448-50 (6th Cir. 2001), arguing that counsel shirked his duty to reasonably investigate and present mitigating evidence.

After the 11.42 evidentiary hearing, Brown prevailed on this issue in Fayette Circuit Court. Appendix, at 243-44. The Kentucky Court of Appeals reversed the trial court, providing the following explanation:

> At the penalty phase, Rather presented as witnesses Brown's sister, Donna Brown, her middle school principal and basketball coach, Bruce Johnson, and Billie Randolph, a family friend for whom Brown baby-sat on several different occasions. Donna Brown testified that her sister was a member of the National Honor Society, the Beta Club, the basketball team (where she was elected captain), the pep club, and student council. She also testified that she did not know the people with whom Brown associated after she dropped out of college very well, but they "seemed to be wilder" than the friends that she had in high school and college. Donna also indicated that her sister tended to be a follower and just "one of the group." She also talked about the fact that Karen was not the type of person to be violent or hurt people, specifically referencing incidents in school where people would try to fight Karen, but she would refuse to fight back. Donna further testified that her sister had no criminal record before the incident in question. Bruce Johnson testified that Brown was a straight-A student and participated in a number of extracurricular

30

activities. He also indicated that she tended to be a follower, but functioned well as a team member because she was a hard worker. Rather testified at the evidentiary hearing that he chose these particular witnesses because he believed that they would portray Brown as a follower.

Again, . . . we recognize the legitimate concerns expressed by Rather at the evidentiary hearing as to the decision not to have Brown testify at the penalty phase. Such testimony had the potential of subjecting Brown to a lengthy and damaging cross-examination, particularly by drawing attention to Brown's statements to the police. We are loathe to second-guess Rather's conscientious strategic decision as to this issue where the record demonstrates that a valid basis for the decision existed. *See Moore v. Commonwealth*, 983 S.W.2d 479, 485 (Ky. 1998).

Moreover, we do not believe that it was ineffective assistance of counsel for Rather not to call the witnesses presented by Brown at the evidentiary hearing. Rather testified that he felt that these witnesses wanted to portray Brown as a leader, which would contradict his strategy of trying to paint her as a follower. It is easy to speculate, in hindsight, that these witnesses might have had a mitigating effect on the jury's sentencing; however, given Rather's strategy and the fact that we believe the testimony of the proffered witnesses would have been at best cumulative and at worst harmful, we cannot hold that failing to have them testify constitutes ineffective assistance of counsel. Moreover, Rather testified that Brown's mother had given him a note indicating that she was physically and mentally incapable of providing testimony, and presenting testimony from Brown's father had the strong potential of revealing a number of past family incidents that could reflect negatively on Brown.

Appendix, at 468-71.

On discretionary review, the Kentucky Supreme Court affirmed the decision of the Court of Appeals. The court detailed Rather's testimony at the 11.42 evidentiary hearing, noting he "testified that he had reviewed potential evidence for the penalty phase but decided that much of it would ultimately hurt his client." *Id.* at 658. The court further noted that Rather believed most of the friends Brown wanted to testify would hurt the defense by calling Brown a leader, thereby increasing her risk of the death penalty. *Id.* According to the court, "Rather discarded other friends as potential witnesses because he feared Appellant's prior incidents of aggressive behavior would surface." *Id.*

In holding that counsel did not provide ineffective assistance by advising Brown not to testify at the penalty phase of her trial, the Kentucky Supreme Court focused on the serious nature of the potential penalty. The court observed that Rather's concerns about Brown testifying during the guilt phase applied during the sentencing phase as well. *Id.* at 671. The court further stated that Rather rightfully focused on avoiding a death sentence during the sentencing phase, and the court noted that his strategy was successful. *Id.* The court concluded

> Hindsight may lead one to guess that it would have been better for Appellant to testify to attempt to gain sympathy from the jury. That is an easy thing to say when you are not gambling with a death sentence. It is a little more intimidating, when you are. Thus, Rather's advice not to testify was not deficient or unreasonable considering the facts of the case. Giving Rather's decision the proper deference, Rather did not provide ineffective assistance of counsel by advising Appellant not to testify during the penalty phase of trial.

*Id.* at 672.

As for the investigation and presentation of other mitigation evidence, the court found that Rather's decision not to call other witnesses was "not deficient or unreasonable when compared to prevailing professional standards under similar circumstances." *Id.* at 673. The court explained that Rather chose witnesses who would further his strategy of making Brown appear less culpable for the crime, and he attempted to minimize evidence regarding Brown's personal and family life that could prove harmful. *Id.* The court held that Rather's "actions certainly fell within reasonable professional standards and he did not, by that standard, provide ineffective assistance of counsel." *Id.*

In other words, the Kentucky Supreme Court found that Rather's investigation and presentation of mitigating evidence was reasonable. The Court cannot displace this

sound and defensible decision. Again, the Court must keep in mind the standard for evaluating Brown's ineffective assistance claims. Although Brown's petition focuses on the ways in which she believes trial counsel's performance fell below the standards of *Strickland*, *Lockett*, and *Wiggins*, the issue before this Court is whether the Kentucky Supreme Court's application of these standards was unreasonable. *See Richter*, 131 S. Ct. at 786. Here, it simply was not. The state court clearly evaluated the entire record and reached a decision about which fairminded jurists could disagree. *See id.* Rather had a deliberate strategy calculated to avoid death. Each choice he made was for a tactical reason. Indeed, the record shows that Rather met with potential witnesses and made conscious choices on inclusion/exclusion. He rejected use of Brown's mother because of her own instability and concerns over impeachment. He again elected against using Brown herself because of the impeachment risks, which were evident. With due deference to the state court's factual findings, habeas relief is precluded.

### 4. Trial Counsel's Failure to Move for a Change of Venue

Finally, Brown claims that Rather's failure to move for a change of venue in the face of "overwhelming pretrial publicity" rendered him constitutionally ineffective. DE #6 at 97. Brown states that "[s]ensational facts regarding lesbianism, male-impersonating acts, and the gay bar and drug underworld in Fayette County created a media frenzy surrounding this case," and she points out that forty-five out of the fifty-six prospective jurors had knowledge about the case through the media. *Id.* at 97-98. Brown notes that Rather testified he wanted to try the case in Fayette County because it involved an alternative lifestyle and he believed Lexington, a university town, would be accepting of that lifestyle. *Id.* at 98-99. She argues, however, that he failed to investigate the depth

33

and effect of the pretrial publicity and failed to consider other college communities in Kentucky that could offer a "neutral, unbiased group of jurors". *Id.* at 99, 101.

Although the Fayette Circuit Court did not directly address Brown's change of venue argument following the evidentiary hearing, *see* Appendix, at 243-45, the Kentucky Court of Appeals specifically rejected it. Appendix, at 472. The Court of Appeals explained that there are "pros and cons" associated with the decision to move for a change of venue. *Id.* According to the court, although "it can be reasonably argued that the case could have been moved to another venue containing a university or college, . . . the case almost certainly would have garnered the same amount of attention given its nature." *Id.* The court stated that it could not say that Rather failed adequately to investigate the depth and effect of publicity surrounding the case on the basis of the record before it. *Id.* at 473. The court refused to second-guess Rather's "conscientious strategic decision" not to seek a change of venue. *Id.* at 472-73.

Notably, the Court of Appeals also found that Brown had not "demonstrated the type of prejudice that would necessarily merit a change of venue." *Id.* at 473. Citing Kentucky Case law, the court explained that "[i]t is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Id.* at 473 (quoting *Kordenbrock v. Commonwealth*, 700 S.W.2d 384, 387 (1985)). The Court of Appeals then distinguished Brown's evidence, demonstrating *awareness* of the case among members of her jury pool, from the evidence present in a case Brown relied on in her brief, in which the defendant demonstrated significant *prejudice* among members of the jury pool. *Id.* at 473-74.

Brown did not raise the venue issue before the Kentucky Supreme Court. *See id.* at 506-21, 529-85. Thus, Brown abandoned her claim at the intermediate appellate court level, and federal habeas review is procedurally barred. Both Petitioner and Respondent, however, appear to seek a merits review of the claim, making their arguments to this Court in terms of the opinion of the Court of Appeals. *See* DE #99-100; DE #19 at 58-60. A review of that decision yields no basis for habeas relief. The Kentucky Court of Appeals reasonably determined the facts and applied the standards of *Strickland* in concluding that trial counsel's performance was not deficient. Because fairminded jurists could disagree about the result reached by the state courts, no § 2254 challenge can prevail. A reasonable argument supports Rather's thought process; no relief thus follows.

## IV. CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000); *see Miller-El v. Cockrell*, 123 S. Ct. 1029, 1039-40 (2003) (discussing development of standard). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. 28 U.S.C. § 2253(c)(3); *see Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). A district court issues a Certificate of Appealability for dismissals on procedural grounds only where the petitioner shows that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a

constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *See Slack*, 120 S. Ct. at 1604.

Here, no Certificate of Appealability will issue. Brown has not made a "substantial showing" as to any claimed denial of rights. The Court believes reasonable jurists would not debate its merits determinations, which hinge on the deferential AEDPA standard and the reasoned decisions from the state courts, which at each appellate level unanimously rejected the various claims. Additionally, the Court believes reasonable jurists would not debate its procedural rulings. The availability of § 2254 relief is not a close question with respect to any of Brown's claims.

## V. CONCLUSION

For the reasons discussed above, the Court hereby **ORDERS** as follows:

1.     The reference of this action to the Magistrate Judge is **WITHDRAWN**;

2.     Brown's petition for writ of habeas corpus (DE #6) is **DISMISSED WITH PREJUDICE**;

3.      A Certificate of Appealability **SHALL NOT ISSUE**; and

4.     Judgment will be entered contemporaneously with this Order.

This the 30th day of March, 2012.

Karl S. Forester, Senior Judge